# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

DONALD D. MacFARLANE, MINOR
CHILD(A), MINOR CHILD(B),

        Plaintiffs,

    v.

STATE OF OREGON DEPARTMENT OF
HUMAN SERVICES, ERINN KEELEY-
SIEHL, KELSEY WIERZBICKI,
CHRISTINA BORDEAU, SUPERVISOR
FOR CHRISTINA BORDEAU, MOLLY
STRONG, JODI HORN, JANICE,
STEVEN TROMMLET, LESLIE
TROMMLET, STATE OF OREGON
DEPARTMENT OF JUSTICE
CONFIDENTIALITY PROGRAM,
MAGDALENA MacFARLANE, JOHN/
JANE DOE,

        Defendants.

3:17-CV-32-PK

FINDINGS AND
RECOMMENDATION

PAPAK, Magistrate Judge:

    Plaintiff *pro se* Donald MacFarlane ("D. MacFarlane" or "plaintiff"), purportedly together

with persons identified as Minor Child(A) ("T.R.") and Minor Child(B) ("K.M."), filed this

action against defendants State of Oregon Department of Human Services ("DHS"), Erinn Kelley-Siehl ("Kelley-Siel"), Kelsey Wierzbicki, Christina Bordeau ("Banderant"), Supervisor for Christina Bordeau, Molly Strong, Jodi Horn (collectively with DHS, Kelley-Siel, Wierzbicki, Banderant, Supervisor for Christina Bordeau, and Strong, the "DHS defendants"), Janice, Steven Trommlet ("S. Trommlitz-Leasia"), Leslie Trommlet ("S. Trommlitz- Leasia" and, collectively with S. Trommlitz-Leasia, the "Trommlitz-Leasias"), State of Oregon Department of Justice Confidentiality Program (the "Program"), Magdalena MacFarlane ("M. MacFarlane"), and a fictitiously named Doe defendant on January 9, 2017. Plaintiff's complaint is not a model of clarity, and determining the precise import of his allegations and the nature of his claims presents a significant challenge. Plaintiff clearly alleges that he is the father of both T.R. and K.M., and that M. MacFarlane is the children's mother. Plaintiff further clearly alleges that both children were taken from their parents by DHS and placed into foster care, where they have been required to attend religious study classes and to participate in religious activities, and that the children's mother is permitted to see the children more often and to give them more expensive gifts than he is. Arising out of the foregoing, plaintiff appears to allege (i) the liability of one or more of the defendants under 42 U.S.C. § 1983 for the violation of his substantive and/or procedural due process rights under the Fourteenth Amendment, and/or the liability of one or more of the defendants under Oregon common law for fraud on the court, in either event arising out of false allegations made against the plaintiff for the purpose of removing the minor children from the custody of their parents, (ii) the liability of one or more of the defendants under Section 1983 for the violation of his substantive and/or procedural due process rights under the Fourteenth Amendment arising out of the deprivation of his interest in visiting his children while they were

in foster care, under Section 1983 for the violation of his procedural due process rights under the Fourteenth Amendment arising out of the seizure of cell phones plaintiff provided to his daughters, and/or under Section 1983 for the violation of his equal protection rights under the Fourteenth Amendment arising out of the fact that defendant M. MacFarlane has been permitted to visit the children in foster care more frequently than plaintiff and has been permitted to give the children more expensive Christmas presents than plaintiff was permitted to do, (iii) the liability of one or more of the defendants under Section 1983 for the violation of either plaintiff's or the children's substantive due process rights arising out of defendants' conduct in separating the children from plaintiff, and (iv) the liability of one or more of the defendants under Section 1983 for violating the establishment clause and/or for the violation of either plaintiff's or the children's substantive due process rights under the Fourteenth Amendment arising out of the conduct of the children's current foster parents in requiring the children to attend religious study classes and to participate in religious activities. Plaintiff seeks $14.4 million in money damages and an additional $1 million in punitive damages. This court has federal question jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and may properly exercise supplemental jurisdiction over plaintiff's state law claim or claims, if any are asserted, pursuant to 28 U.S.C. § 1367(a).

Now before the court are plaintiff's motion (#8) for summary judgment and the cross motion (#15) to dismiss plaintiff's claims brought by defendants DHS, Kelley-Siel, Wierzbicki, Banderant, Strong, Horn, the Trommlitz-Leasias, and M. MacFarlane (collectively, the "moving defendants"). I have considered the motions and all of the pleadings and papers on file. For the reasons set forth below, plaintiff's motion (#8) for summary judgment should be denied, and the

moving defendants' motion (#15) to dismiss should be granted in part and denied in part as discussed below.

## LEGAL STANDARD

### I.     Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000).

## II.     Motion to Dismiss for Lack of Subject-Matter Jurisdiction

The federal courts are courts of limited jurisdiction. *See, e.g., Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005), *citing Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). As such, the courts presume that causes of action "lie[] outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377; *see also, e.g., Vacek v. United States Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006).

A motion under Federal Civil Procedure Rule 12(b)(1) to dismiss for lack of subject-matter jurisdiction may be either "facial" or "factual." *See Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004), *citing White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack on subject-matter jurisdiction, the moving party asserts that a plaintiff's allegations are insufficient on their face to invoke federal jurisdiction, whereas in a factual attack, the moving party disputes the factual allegations that, if true, would give rise to subject-matter jurisdiction. Where a defendant raises a facial challenge to subject-matter jurisdiction, the factual allegations of the complaint are presumed to be true, and the motion may be granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003). By contrast, where a defendant raises a factual challenge to federal jurisdiction, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment," *Safe Air v. Meyer*, 373 F.3d at 1039, *citing Savage*, 343 F.3d at 1039 n. 2, and "need not presume the truthfulness of the plaintiff's allegations," *id., citing White*, 227 F.3d at 1242. In that event,

where the question of jurisdiction is capable of consideration independently of the merits of the claims being asserted, the court may resolve questions of disputed fact for purposes of making its jurisdictional determination. *See Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008), *quoting Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987), *quoting Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983), *quoting Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). Where the jurisdictional inquiry is inextricably bound up with the substance of the case, the court assumes the truth pf the plaintiffs allegations except where controverted by undisputed evidence. *See id.*

"Defective allegations of jurisdiction may be amended, upon terms, in trial or appellate courts." 28 U.S.C. § 1653. It is improper to dismiss an action based on a defective allegation of jurisdiction without leave to amend "unless it is clear, upon de novo review, that the complaint could not be saved by amendment." *Snell v. Cleveland, Inc.*, 316 F.3d 822, 828 n.6 (9th Cir. 2002), *citing Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001).

## III. Motion to Dismiss for Failure to State a Claim

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R.

Civ. P. 8(a). Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *citing Twombly*, 550 U.S. at 556. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009), *citing Iqbal*, 556 U.S. at 678.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007). Moreover, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not, however, accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## FACTUAL BACKGROUND

### I.     The Parties

Plaintiff D. MacFarlane is an individual resident of Oregon. Purported plaintiff T.R. is a minor child currently in foster care in Oregon, and is the daughter of defendant M. MacFarlane.

T.R. is apparently neither plaintiff's biological nor legal daughter. *See* Declaration of Jill

Schnieder ("Schnieder Decl."), Exh. 3 ("DHS Report") at 2. Purported plaintiff K.M. is likewise

a minor child currently in foster care in Oregon; unlike T.R., K.M. is apparently plaintiff's

biological and legal daughter. *See id.* D. MacFarlane alleges that he "will be representing both

[T.R. and K.M.] in this legal matter." *See* Complaint at 1.

Moving defendant DHS is an agency of the State of Oregon charged with providing

human services to Oregon residents. Moving defendant Kelley-Siel was at material times the

director of DHS. Moving defendants Wierzbicki, Banderant, Strong, and Horn were at material

times DHS employees. Moving defendants the Trommlitz-Leasias are the current foster parents

of T.R. and K.M. Moving defendant M. MacFarlane is the mother of T.R. and K.M.

Defendants Supervisor for Christina Bordeau, Janice, and the Program have made no

appearance in this action to date. It appears that Supervisor for Christina Bordeau was at

material times a DHS employee, that Janice is a former foster parent of T.R. and K.M., and that

the Program is a program administered by the Oregon Department of Justice ("DOJ").

All individual defendants herein are sued "in their individual, personal, business, and

official capacities." *See id.*

## II.    Plaintiff's Allegations in Support of his Claims[1]

Plaintiff alleges, somewhat obscurely, that defendant M. MacFarlane "sought out some

sort of CONFIDENTIALITY PROGRAM through branch office of Oregon City, Oregon DHS"

in or around 2010 or 2011. Complaint at 2. Plaintiff appears to allege his belief that, at or

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of
the allegations of plaintiff D. MacFarlane's complaint in the light most favorable to him.

around that time, M. MacFarlane successfully located such a program, and successfully enrolled in it through false representations about plaintiff (although his allegations neither imply nor suggest that he has either evidence or actual knowledge of M. MacFarlane's enrollment in any such program at or around that time). *See id.* In any event, plaintiff's allegations suggest that he had no contact or communication with M. MacFarlane, T.R., or K.M. from 2010 or 2011 through some time in 2014, *see id.*, although, as discussed below, the record contains some evidence to the contrary.

In 2014, M. MacFarlane contacted plaintiff in Oregon from out of state, requesting money. *See id.* Plaintiff apparently paid for M. MacFarlane, T.R., and K.M. to travel back to Oregon. *See id.* Upon their return to Oregon, the children told plaintiff stories about their recent experiences while in their mother's care that plaintiff found horrifying. *See id.* Plaintiff's claims in this action do not, however, arise out of any of the foregoing. *See id.* at 3. It appears that M. MacFarlane, T.R., and K.M. began living with plaintiff following their return to Oregon. *See id.*

In or around early January 2015, either T.R. or K.M. told plaintiff that M. MacFarlane was planning to hire someone to kill plaintiff. *See id.* On or around January 5, 2015, plaintiff sought a restraining order against M. MacFarlane from the Multnomah County court. *See id.*

On January 8, 2015, either T.R. or K.M. told plaintiff that M. MacFarlane was planning to abscond with both children. *See id.* On the morning of January 9, 2015, plaintiff opened the curtains of the room in which M. MacFarlane was sleeping over M. MacFarlane's strenuous objections. *See id.* M. MacFarlane responded by physically assaulting plaintiff, causing him to suffer harm. *See id.* at 4.

That same morning, plaintiff drove the children to their school and advised the school

Page 9 - FINDINGS AND RECOMMENDATION

principal that he believed their mother was planning to abscond with them. *See id.* That afternoon, plaintiff received a telephone call from a DHS worker advising him that she was at the children's school. *See id.* Apparently, DHS took custody of the children that day, and subsequently placed them in foster care. *See id.*

Some time later, it appears that a schedule was established for both plaintiff and M. MacFarlane to visit the children in foster care. *See id.* at 4, 5. M. MacFarlane was permitted to make weekly visits to the children, whereas plaintiff was only permitted to make monthly visits. *See id.* at 5. Sometimes when a visit was scheduled for plaintiff, the visit would be canceled without prior notice to him. *See id.* at 4.

Also at some time later, possibly in or around February 2015, it appears that plaintiff provided the children with cell phones. *See id.* At some subsequent time, some person took the cell phones away from the children. *See id.* At some time possibly in or around September 2015, plaintiff either threatened to file suit against the State of Oregon or did file suit against the State of Oregon. *See id.* at 5. Plaintiff alleges his belief that the cell phones were "undoubtedly immediately returned" to the children thereafter, although the State of Oregon never responded to plaintiff's actual or threatened lawsuit. *See id.*

At Christmas 2015, plaintiff was not permitted to give the children a $100 gift card, whereas M. MacFarlane was permitted to give the children "4-5 good size shopping bags" of gifts. *See id.*

In foster care, the children have been required to attend religious studies classes and, apparently, to profess some particular religious belief. *See id.* at 6.

## III. The Parties' Evidentiary Proffers[2]

### A. Plaintiff's Evidentiary Proffer

In support of his motion (#8) for summary judgment, plaintiff offers his own declaration testimony in material part as follows. Beginning in 2010 or 2011, DHS and/or the DOJ willfully concealed the location of M. MacFarlane, T.R., and K.M. from plaintiff by and through the Program. *See* Declaration of Donald D. MacFarlane ("Plaintiff Decl."), ¶ 1, 4. At the time, M. MacFarlane had outstanding warrants for her arrest in California for possession of methamphetamine. *See id.*, ¶ 1. DHS had actual knowledge of the outstanding warrants by not later than 2006. *See id.*, ¶ 2.

On January 8, 2015, K.M. advised plaintiff that M. MacFarlane was planning to abscond with her and her sister, T.R. *See id.*, ¶ 6. On January 9, 2015, plaintiff relayed that same information to the principal of the school T.R. and K.M. were attending. *See id.*, ¶ 7. The principal asked plaintiff why he did not contact DHS to report M. MacFarlane's intentions, and plaintiff responded that he was not on good terms with DHS. *See id.*

Later that afternoon, plaintiff received a telephone call from defendant Wierzbicki, a DHS employee working in its Child Protective Services division. *See id.*, ¶ 8. Wierzbicki reported to plaintiff that she was at the children's school. *See id.* DHS took the children into custody that same day. *See id.* DHS did so on the basis of false allegations against plaintiff. *See id.*, ¶ 11.

At some point, plaintiff was given the right to visit the children on a monthly basis only.

---

[2] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

*See id.*, ¶ 13. Sometimes such visits have been canceled without prior notice to plaintiff. *See id.*, ¶ 14.

Plaintiff provided the children with cell phones at his own expense, so that they could call him when they chose. *See id.*, ¶ 15. At some point, the phones were taken from the children "by DHS, foster parent, and or someone" without a prior or subsequent hearing. *Id.*, ¶ 16. The cell phones were returned to the children after plaintiff filed a tort claim against the State of Oregon. *See id.*, ¶ 20.

**B.    Moving Defendants' Evidentiary Proffer**

DHS issued a Protective Custody Report on January 20, 2015, in connection with the agency's decisions to remove T.R. and K.M. from their mother's custody on January 9, 2015, and to take them into protective custody on January 20, 2015. *See* Schneider Decl., Exh. 1 ("PCR"). Also on January 20, 2015, DHS filed a petition with the Juvenile Department of the Multnomah County court for the court's determination how best to provide for the welfare of the children. *See id.*, Exh. 4 ("DHS Petition"). Also on January 20, 2015, the Multnomah County Court held a preliminary hearing to consider the children's custody and issued an Initial Shelter Order reflecting its preliminary findings. *See id.*, Exh. 2 ("ISO"). On February 26, 2015, DHS submitted a report to the Multnomah County Court in connection with the preliminary hearing. *See* DHS Report. On May 7, 2015, the Multnomah County court issued final Findings and Orders regarding the children's custody, by and through which it made T.R. a ward of the court and ordered that K.M. remain in temporary DHS custody together with T.R. pending resolution of certain outstanding issues. *See id.*, Exh. 5 ("MCC F&O"). The Multnomah County court issued its judgment in the matter May 18, 2015, attaching thereto an exhibit setting forth its

material findings. *See id.*, Exh. 6 ("MCC Findings").

By and through its Protective Custody Report, DHS asserted that plaintiff and M. MacFarlane had a "serious history of Domestic Violence dating back to 2004." PCR at 2. By and through its Initial Shelter Order, the Multnomah County Court issued a finding that plaintiff and M. MacFarlane dissolved their marriage in 2006. *See* ISO at 1. By and through its Protective Custody Report, DHS further asserted that T.R. and K.M. were taken from both their parents' custody in June 2006, when both parents were arrested for "Assault IV" and M. MacFarlane was additionally charged with "Harassment," and that (notwithstanding the apparent 2006 dissolution of plaintiff's marriage to M. MacFarlane) both children were returned to both parents in December 2007. PCR at 2.

DHS further asserted that M. MacFarlane had "a history of being unresponsive to DHS involvement" and of "fleeing to Arizona during an open [Child Protective Services] assessment." *Id.* It appears possible, but is by no means established, that M. MacFarlane's apparent flight to Arizona during the pendency of a Child Protective Services assessment may correspond to the period beginning in 2010 or 2011 when plaintiff was purportedly out of contact with his ex-wife and both children, and apparently developed the belief that DHS and/or the DOJ were concealing their location from him.

The Multnomah County court found that at some point, apparently between 2010 and 2014, when M. MacFarlane, T.R., and K.M. were residing in Arizona, plaintiff filed for legal custody of K.M. with an Arizona court (notwithstanding plaintiff's allegations that DHS and/or DOJ were at that time concealing from him the location of M. MacFarlane, T.R., and K.M.). *See* MCC Findings at 4. The Multnomah County court noted plaintiff's report that the judge in the

Arizona custody proceeding spoke with M. MacFarlane on the phone and thereafter formally awarded custody of K.M. to M. MacFarlane, with weekend "parenting time" to plaintiff. *Id.*

Beginning in or around 2014, it appears that M. MacFarlane and the children were residing in Oregon with plaintiff. DHS considered and rejected removing the children from plaintiff's and M. MacFarlane's custody in June 2014 when plaintiff and M. MacFarlane engaged in an argument at plaintiff's workplace, and again in September 2014 when it was determined that neither T.R. nor K.M. was enrolled in school. *See* PCR at 2. On January 9, 2015, a report was made to DHS that T.R. and K.M. were at risk of harm from domestic violence by their mother and an unidentified person (impliedly, a boyfriend of M. MacFarlane) and from neglect by their mother. *See id.* DHS contacted the children's school principal, who advised that the children had only been enrolled in school for two weeks, that she was concerned the children would be taken out of state that weekend, and that plaintiff had spoken with her that morning and reported domestic violence in the home. *See id.* DHS interviewed both children separately at the school that same day. *See id.*

DHS recorded that K.M. reported that her mother had assaulted plaintiff that morning in a dispute over opening a window, that M. MacFarlane frequently lied, that she had seen M. MacFarlane apply make up to simulate bruising on her body that she later claimed had been caused by significant others, that one of M. MacFarlane's boyfriends had threatened to hit her with a paddle, and that she primarily lived with her sister and mother. *See id.* at 2-3. DHS recorded that K.M. further reported that plaintiff and M. MacFarlane fought frequently, that M. MacFarlane tended to fight "with her words and hands," that M. MacFarlane threw things at and pushed plaintiff, and that plaintiff did not like to fight and did not want to hurt anyone, but that

plaintiff had a bad temper, yelled a lot, and could be scary. *Id.* at 3. DHS recorded that K.M. further reported that M. MacFarlane would discipline her when she got in trouble by pulling her hair and striking her arm or face, whereas plaintiff would discipline her by yelling. *See id.* DHS recorded that K.M. further reported that she thought M. MacFarlane was planning to take her away to another state that weekend, and that the prospect made her uncomfortable. *See id.*

DHS further recorded that T.R. reported that she could think of nothing she did not like about plaintiff, that plaintiff and M. MacFarlane fought frequently, that M. MacFarlane had pushed plaintiff down earlier that day, that she was worried M. MacFarlane was about to move her out of state, and that she was worried she would be unable to see plaintiff if that occurred. *See id.*

DHS asserted that DHS worker Wierzbicki met with M. MacFarlane that afternoon when she came to pick up the children from school. *See id.* DHS recorded that M. MacFarlane "was very reluctant to answer questions with DHS and . . . did not seem to be forthcoming with information regarding [the family's] instability, domestic violence concerns or future plans." *Id.* DHS recorded that M. MacFarlane was initially reluctant to answer questions about having packed up her belongings and those of her daughters, but that eventually she conceded that she had purchased air tickets to Arizona. *See id.* at 4. DHS recorded that M. MacFarlane claimed plaintiff had historically sexually abused K.M., but that she was unable or unwilling to provide details regarding the purported abuse. *See id.*

DHS determined that the children's home environment was not safe for them, and on that basis made the decision to remove the children from M. MacFarlane's custody. *See id.* DHS took the children from their school and brought them to the home of their paternal grandmother,

plaintiff's mother ("S. MacFarlane"). *See id.*

Three days later, on January 12, 2015, DHS spoke with S. MacFarlane over the telephone. *See id.* S. MacFarlane advised DHS that she had attempted to pick up clothing and toys for the children from their home, only to discover that M. MacFarlane had removed all such items from the premises. *See id.* DHS called M. MacFarlane, who confirmed that she had removed all the children's belongings from the home. *See id.* DHS recorded that M. MacFarlane told DHS that the children could have their clothes and toys back when they were back in M. MacFarlane's care, and that while they were in the care of plaintiff and his mother, plaintiff and his mother could buy them new clothes and toys. *See id.*

DHS referred the matter to CARES NW. *See id.* CARES NW subsequently reported to DHS that an appointment was warranted for both children to discuss concerns of domestic violence and possible neglect by M. MacFarlane. *See id.* DHS recorded that CARES NW reported that when they called M. MacFarlane to obtain her consent to such an appointment, she was rude and refused her consent. *See id.*

DHS met with plaintiff at his home on January 14, 2015. *See id.* DHS recorded that plaintiff reported that M. MacFarlane had legal custody of both children. *See id.* DHS recorded that plaintiff further reported that, over the previous few years, M. MacFarlane and both children had lived in several different states, including Texas, California, Colorado, and Oregon (apparently omitting Arizona from the list). *See id.* DHS recorded that plaintiff disclosed his belief that M. MacFarlane had a pattern of meeting men online and then moving in with them. *See id.* DHS recorded that plaintiff reported his concern that M. MacFarlane's mental health issues were endangering the children. *See id.*

On the basis of the foregoing, DHS requested court determination that it was in the best interests of the children to place them in temporary DHS custody, and that K.M. specifically be placed in the care of a relative (specifically, of S. MacFarlane, plaintiff's mother). *See id.* at 4-5.

On January 20, 2015, DHS petitioned the Multnomah County court to determine what custody arrangement would best promote the children's welfare. *See* DHS Petition. That same day, the Multnomah County court held a preliminary hearing for that purpose. *See* ISO. Both plaintiff and M. MacFarlane attended the hearing. *See* DHS Report at 2. The court noted the existence of an Arizona custody decree awarding custody of K.M. to M. MacFarlane, and that plaintiff had not sought modification of that decree. *See* ISO at 2. The court found that it would not be in the interests of the children's welfare for them to remain in M. MacFarlane's custody, noted that DHS was making efforts to keep both children together, ordered the children into temporary DHS custody, and ordered a second hearing. *See id.* at 2-3. The court ordered that DHS (with the approval of the Deputy District Attorney and a person or agency apparently identified as "YRT") determine plaintiff's and M. MacFarlane's respective rights to visit the children. *See id.* at 3.

Following the preliminary hearing, on February 26, 2015, DHS reported to the Multnomah County court that M. MacFarlane had refused to provide DHS with information about her address since leaving plaintiff's home on January 9, 2015, that M. MacFarlane had been given the opportunity for weekly visits with the children since they were taken into DHS custody, and that M. MacFarlane had canceled half of the permitted visits for various asserted reasons. *See* DHS Report at 3, 9. DHS further reported to the Multnomah County court that plaintiff had been in steady communication with DHS, that he had been given the opportunity for weekly

visits with the children since they were taken into DHS custody, and that he had attended all scheduled visits. *See id.* at 3-4, 9. DHS further reported that the children's foster mother had reported that M. MacFarlane had recently remarried, that the children had been upset to learn of the remarriage over the telephone, and that the children described M. MacFarlane's new husband as "horrible" and "a creep." *Id.* at 3. DHS reported that the children had been placed in foster care with a non-relative following the preliminary hearing, and then moved to a new foster family on January 31, 2015. *See id.* DHS reported an extensive history of violent and otherwise bad relations between plaintiff and M. MacFarlane, and a significantly more extensive history of violent and otherwise bad relations between M. MacFarlane and various of her boyfriends. *See id.* at 5-6. DHS found that M. MacFarlane's documented mental health problems, residential instability, and chaotic lifestyle interfered with her ability safely to parent the children. *See id.* at 6-7. DHS further found that plaintiff's relations with M. MacFarlane placed the children at risk of emotional harm, and noted that some witnesses interviewed by DHS suggested that plaintiff had anger management issues. *See id.* at 7-8. DHS recommended that T.R. be made a ward of the state. *See id.* at 11.

On May 7, 2015, the Multnomah County Court issued an order by and through which it reaffirmed its prior custody determinations for the children, except that, in addition, it made T.R. a ward of the State of Oregon. *See* MCC F&O at 3-4. The court further ordered that M. MacFarlane attend parenting classes, obtain stable and suitable housing, maintain regular visitation with the children, undergo psychological evaluation, maintain contact with DHS, enroll in domestic violence counseling, and sign releases of information for DHS. *See id.* at 5. The court issued no such order in connection with plaintiff. *See id., passim.* The court's judgment

issued May 18, 2015, together with findings of fact that M. MacFarlane frequently engaged in

acts of violence, heavy drinking, and drug use in the children's presence, and was in the habit of

striking them physically and of threatening them. *See* MCC Findings at 2-3. The court further

found that when asked to identify her family members, K.M. first identified plaintiff, and only

identified M. MacFarlane after first listing "multiple other more extended relatives." *Id.* at 3.

The court specifically found that M. MacFarlane "present[ed] a current and real threat" to K.M.'s

safety. *Id.* at 4. By contrast, the court found that DHS's reports of visits between plaintiff and

K.M. were "generally very positive." *Id.* However, the court found that because of the Arizona

decree awarding M. MacFarlane custody of K.M., it could not remand K.M. to plaintiff's custody,

and that therefore the only means available to prevent K.M. from being returned to M.

MacFarlane's custody, where her safety would be endangered, was to keep K.M. in foster care (at

least until such time as plaintiff was able to obtain an "order granting him legal custody of

K[.M.]"). *Id.* at 4-5.

## ANALYSIS

**I.      Plaintiff's Claims to the Extent Purportedly Brought on Behalf of T.R. and/or K.M.**

As noted above, it is plaintiff's position that he represents minor children T.R. and K.M.

in this action. Minor children may appear in federal court only by and through a guardian or

representative, and may not to do in their own behalf. *See* Fed. R. Civ. P. 17(c). However, in

order to serve as another party's legal representative, a person must be licensed to practice law.

*See Johns v. County of San Diego*, 114 F.3d 874, 876-877 (9th Cir. 1997) (citations omitted). In

consequence, a non-attorney guardian may bring an action on behalf of a minor child or an

incapacitated party, but that guardian must first retain a licensed legal representative. *See id.*

Here, it is undisputed that plaintiff is not licensed to practice law in Oregon. Because T.R. and K.M. are unrepresented by an attorney and lack capacity to represent themselves, plaintiff's claims should be dismissed without prejudice to the extent brought on behalf of T.R. and/or K.M., and T.R. and K.M. should be dismissed without prejudice as parties to this action. Such disposition should not be construed as barring plaintiff from seeking to join T.R. and/or K.M. as co-plaintiffs should he establish his status as guardian to both children and retain licensed legal counsel to represent them.

## II.     Plaintiff's Section 1983 Claims to the Extent Brought Against the Trommlitz-Leasias and/or Janice

To the extent that plaintiff's claims are properly cognizable as arising under Section 1983, it is a *sine qua non* of liability in connection with any such claim that a defendant's complained-of conduct have been undertaken under color of state law. Specifically, Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

42 U.S.C. § 1983.

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989), *quoting Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979); *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). "Traditionally, the requirements for relief under section 1983 have been articulated

Page 20 - FINDINGS AND RECOMMENDATION

as: (1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991); *see also Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986) (Section 1983 plaintiffs are required to "plead that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes").

"When addressing whether a private party acted under color of law, [the courts of the Ninth Circuit] start with the presumption that private conduct does not constitute governmental action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999), *citing Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992) ("Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes"), *Price v. Hawaii*, 939 F.2d 702, 707-708 (9th Cir. 1991) ("Private parties are not generally acting under color of state law"). The Ninth Circuit has recognized four different tests for determining when private conduct constitutes government action for purposes of a Section 1983 claim: "(1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus." *Id.* at 836 (citations omitted). As to all four of the recognized tests, it is clear that "there is no specific formula for defining state action." *Id.*, *quoting Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983). "Instead, 'contemporary decisions stress the necessity of a *close nexus* between the state and the challenged conduct rather than application of a mechanistic formula.'" *Id.* (emphasis added in original), *quoting Wagner v. Metropolitan Nashville Airport Auth.*, 772 F.2d 227, 229 (6th Cir. 1985).

With specific respect to foster parents, the Ninth Circuit has opined as follows in an

Page 21 - FINDINGS AND RECOMMENDATION

unpublished disposition, noting that at least several other circuits have expressly found that foster

parents do not act under color of state law, notwithstanding that they receive compensation for

providing foster care from the state:

> Merely serving as a foster parent does not transform a private party into a state
> actor. *See United States v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005) ("[F]oster
> parents are generally not considered agents of the state."); *Leshko v. Servis*, 423
> F.3d 337, 347 (3d Cir. 2005) (holding that foster parents are not state actors under
> § 1983); *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001)
> (same); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990) ("[H]arm
> suffered by a child at the hands of his foster parents is not harm inflicted by state
> agents.").

*Ismail v. Cty. of Orange*, Case No. No. 14-56486, 2017 U.S. App. LEXIS 8826, *9 (9th Cir. May

19, 2017) (modifications original). I agree with the *Ismail* court that foster parents are not state

actors. Parenting children is not an exclusively or primarily public function, foster parents do not

raise children jointly with the state, governmental compulsion is not at issue in a foster parent-

child relationship, and the nexus between foster parents and the state is too attenuated and

indirect to give rise to state-actor status. *See Sutton*, 192 F.3d at 836. Because as a matter of law

plaintiff cannot establish that the foster parent defendants acted under color of state law, he

cannot prevail on any Section 1983 claim against any of S. Trommitz-Leasia, L. Trommitz-

Leasia, or Janice (collectively, the "foster-parent defendants") arising out of those parties'

complained-of conduct.

For the foregoing reasons, plaintiff's motion for summary judgment should be denied as

to all of plaintiff's claims to the extent alleged against the foster-parent defendants, the moving

defendants' motion to dismiss should be granted as to all of plaintiff's claims to the extent alleged

against the foster-parent defendants, and all of plaintiff's claims should be dismissed with

prejudice to the extent alleged against the foster-parent defendants.

### III.    Plaintiff's Claims Against the Remaining Defendants

    **A.**    **Plaintiff's First Enumerated Claim(s) (Arising Out of Alleged False Statements Made About Plaintiff in Support of DHS' Removal of T.R. and K.M. From Parental Custody on January 9, 2015) and Third Enumerated Claim (Arising Out of Harm Suffered by T.R. and K.M. in Consequence of Removal from Parental Custody)**

As noted above, plaintiff's first enumerated claim (or set of claims) arises out of false statements allegedly made about the plaintiff in support of the removal of T.R. and K.M. from parental custody on January 9, 2015. *See* Complaint at 4. Close analysis of plaintiff's pleading indicates that the first enumerated claim or set of claims is intended to allege one or more defendants' liability under Oregon common law for fraud on the court and/or under Section 1983 for the violation of plaintiff's substantive and/or procedural due process rights under the Fourteenth Amendment. In support of his motion for summary judgment as to this claim, plaintiff offers his own testimony that DHS removed the children from parental custody on the basis of "false charges . . . that were proved to be false." Plaintiff Decl., ¶ 11. Plaintiff offers no evidence as to the nature of the purported "false charges" DHS brought against him.

Also as noted above, plaintiff's third enumerated claim arises out of harm suffered by T.R. and K.M. as a result of being removed from plaintiff's custody. *See* Complaint at 5. To the extent that the claim is brought on behalf of T.R. and/or K.M., as discussed above it is subject to dismissal without prejudice because neither T.R. nor K.M. is represented by licensed legal counsel, and each is a minor child lacking capacity to appear on her own behalf. To the extent that the claim may be brought on the plaintiff's own behalf, it appears to sound in substantive due process, and to be intended to allege the liability of one or more of the defendants under Section

1983 for the violation of plaintiff's Fourteenth Amendment substantive due process right to direct the education of his children.

In opposition to plaintiff's motion for summary judgment, and in support of their own motion to dismiss on jurisdictional grounds, the moving defendants offer evidence, discussed at length above, tending to establish that DHS' primary concern in removing the children from parental custody was to safeguard the children from possible abuse or neglect at the hands of defendant M. MacFarlane, in large part in light of the fact that plaintiff was not in a position to protect the children from her given that he was not T.R.'s biological or legal father, that an Arizona custody decree gave M. MacFarlane sole custody of K.M., and that plaintiff had a history of allowing M. MacFarlane to continue to play a role in the children's lives notwithstanding the risk of harm to them that her lifestyle presented. *See* PCR at 2-5, DHS Report at 2-8. No charges against plaintiff were stated in DHS' petition to the Multnomah County court for its determination of the custody arrangement that would best promote the children's welfare. *See* DHS Petition, *passim.* The Multnomah County court, in turn, did not base its custody determinations on any charges regarding plaintiff, other than its conclusion that, under the circumstances, he was not in a position to prevent the children from coming under M. MacFarlane's care. *See* ISO, *passim*; MCC F&O, *passim*; MCC Findings, *passim.*

More critically, moving defendants' evidentiary proffer establishes (and I so find) that the propriety of the removal of the children from parental custody was the subject of litigation in state court, and that at the conclusion of proceedings in which plaintiff and M. MacFarlane participated, the court determined the removal to have been appropriate and in the children's best interests. *See* ISO, MCC F&O, MCC Findings. In consequence, plaintiff's first and third

enumerated claims or sets of claims, whatever cause or causes of action they may be construed as intended to state, run afoul of the so-called *Rooker-Feldman* doctrine, such that this court lacks jurisdiction to consider their merits.

Under the *Rooker-Feldman* doctrine, the federal courts lack jurisdiction to exercise appellate review over state court judgments. *See Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 858-859 (9th Cir. 2008); *see also D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923). "The clearest case for dismissal based on the *Rooker-Feldman* doctrine occurs when 'a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision . . . .'" *Henrichs v. Valley View Dev.*, 474 F.3d 609, 613 (9th Cir. 2007), *quoting Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003). However, the doctrine is equally applicable to bar the federal courts "from exercising subject matter jurisdiction over a suit that is a *de facto* appeal from a state court judgment." *Reusser*, 525 F.3d at 859, *quoting Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139 (9th Cir. 2004), *citing Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003). An action brought in federal court constitutes such an appeal if "claims raised in the federal court action are 'inextricably intertwined' with [a] state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules." *Id.*, *quoting Bianchi*, 334 F.3d at 898. In essence, the *Rooker-Feldman* doctrine provides that "a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005-

1006 (1994) (citations omitted).

Here, plaintiff's first and third enumerated claims, however construed, are inextricably intertwined with the Multnomah County court's decision and judgment such that to grant plaintiff relief on those claims would necessarily undercut the state court's decision. To the extent the plain language in which the first enumerated claim (or set of claims) is couched is given its ordinary meaning, the claim appears most clearly to sound under Oregon law in tort as fraud on the court, presumably by one or more of the DHS defendants. Under Oregon law, a cause of action for fraud on the court constitutes a challenge to any court judgment issued at least in part in reliance on a fraudulent misrepresentation made to the court by a party before it. *See, e.g.*, Or. R. Civ. P. 71C (recognizing the inherent power of the courts to set aside an issued judgment for fraud upon the court); Or. Rev. Stat. § 419B.923(8) (same); *see also Taylor v. Fannie Mae*, 374 F.3d 529, 533 (7th Cir. 2004) (finding a claim of fraud on a state court to be inextricably intertwined with the merits of the state court's judgment, and on that basis concluding that the federal courts lacked jurisdiction to consider the claim). Construed as a claim for fraud on the court, this court therefore lacks jurisdiction to consider the merits of the claim under the *Rooker-Feldman* doctrine.

To the extent plaintiff's allegations in support of his first and third enumerated claims may be construed as stating either substantive or procedural due process violations, the same conclusion obtains. To the extent it is plaintiff's position that he was denied due process in connection with the decision to remove the children from parental custody or otherwise in connection with representations made about him in support of that decision, to the extent it is plaintiff's position that the hearings he attended in connection with DHS' removal of the children

from parental custody were inadequate or unconstitutionally unfair to him, and/or to the extent it is plaintiff's position that removing the children from his custody violated his substantive due process right to direct the children's education, his claims are, again, inextricably intertwined with the Multnomah County court's decision that it was in the best interests of the children to remove them from parental custody, to make T.R. a ward of the state, and to place K.M. into foster care at least until such time as plaintiff was able to obtain an order granting him custody over her. *See, e.g., Cooper v. Ramos*, 704 F.3d 772, 781-783 (9th Cir. 2012) (finding procedural and substantive due process claims arising out of a state court's decisions regarding admission or exclusion of evidence at a proceeding to be inextricably intertwined with the state court's decision, and on that basis concluding that the federal courts lacked jurisdiction to consider the claims). This court therefore lacks jurisdiction to consider the first and third enumerated claims' merits under the *Rooker-Feldman* doctrine to the extent they may be construed as due process claims.

For the foregoing reasons, I find that this court may not properly consider the merits of plaintiff's first or third enumerated claims (although a state court would not be similarly barred). In consequence, this court should grant defendants' motion to dismiss as to the first and third enumerated claims on jurisdictional grounds, should deny plaintiff's motion for summary judgment to the extent it addresses the first and third enumerated claims, and should dismiss plaintiff's first and third enumerated claims without prejudice for lack of subject-matter jurisdiction.

/ / /

/ / /

Page 27 - FINDINGS AND RECOMMENDATION

**B. Plaintiff's Second Enumerated Claim(s) (Arising Out of Alleged Unnoticed Cancellation of Parental Visits, Seizure of Cell Phones, and/or Discriminatory Grant of Access to the Children in Foster Care)**

As noted above, plaintiff's second enumerated claim (or set of claims) arises out of the alleged unnoticed cancellation of plaintiff's scheduled visits with T.R. and K.M., the seizure of the cell phones plaintiff had made available to T.R. and K.M., and/or the fact that M. MacFarlane was permitted more frequent visits with the children and was allowed to give them more expensive Christmas presents than plaintiff was. *See* Complaint at 4. Analysis of plaintiff's pleading, and of the evidence adduced in support thereof, indicates that the second enumerated claim or set of claims is, more specifically, intended to allege the liability of one or more of the DHS defendants and/or the foster-parent defendants under Section 1983 for the violation of plaintiff's substantive and/or procedural due process rights arising out of the cancellation of plaintiff's parental visits without prior notice, the liability of the foster-parent defendants, DHS, or some other defendant under Section 1983 arising out of the confiscation of the children's cell phones without due process of law in violation of plaintiff's Fourteenth Amendment procedural due process rights, and/or the liability of one or more of the DHS defendants for the violation of the Fourteenth Amendment's guarantee of equal protection under the law arising out of the grant to M. MacFarlane of more frequent parental visit rights than were granted to plaintiff and/or out of permission granted to M. MacFarlane to give the children more expensive Christmas gifts than plaintiff was permitted to give. In support of his second enumerated claim or set of claims, plaintiff offers his own testimony that "visits were cancelled with no notice to plaintiff that visits were cancelled," Plaintiff Decl., ¶ 14, and that "Phones were seized 1 day by DHS, foster parent, and or someone. Wow, no due process provided for the illegal seizure of my paid for property,"

*id.*, ¶ 16. Plaintiff offers no evidence in support of his putative equal protection claim.

In opposition to plaintiff's second enumerated claim or set of claims, and in support of their own motion to dismiss on jurisdictional grounds, the moving defendants offer evidence tending to establish that between January 20 and February 26, 2015, both M. MacFarlane and plaintiff had been granted the right to visit the children on a weekly basis, and that plaintiff had taken advantage of all scheduled visits whereas M. MacFarlane had cancelled half her scheduled visits for various reasons. *See* DHS Report at 3-4, 9. In addition, moving defendants' evidentiary proffer establishes that DHS' determination of plaintiff's and M. MacFarlane's respective rights to visit the children in foster care was made pursuant to authority granted by the Multnomah County court following proceedings that both plaintiff and M. MacFarlane attended. *See* ISO, MCC F&O. Moving defendants offer no evidence in connection with unnoticed cancellation of parental visits or seizure of cell phones, no evidence as to parental visit rights granted to either plaintiff or M. MacFarlane subsequent to February 26, 2015, and no evidence as to differential treatment of plaintiff and M. MacFarlane in connection with their rights to give the children Christmas gifts.

To the extent plaintiff's second enumerated claim or set of claims arises out of differential treatment of plaintiff and M. MacFarlane in connection with their respective rights to parental visits, because DHS determined those rights pursuant to authority granted by the Multnomah County court, this court lacks jurisdiction to consider the claim or set of claims under the *Rooker-Feldman* doctrine, *supra*. Specifically, because it would undermine the state court's ruling for this court to interfere with DHS determination of plaintiff and M. MacFarlane's respective parental visit rights, plaintiff's claim (to the extent it arises out of the differential

treatment of those rights) is inextricably intertwined with the state court's decision, and as such this court is without jurisdiction to consider it (although a state court would not be similarly barred). *See Reusser*, 525 F.3d at 859. To the extent plaintiff's second enumerated claim or set of claims arises out of differential treatment of plaintiff and M. MacFarlane in connection with their respective rights to parental visits, it follows that the moving defendant's motion to dismiss should be granted as to the second enumerated claim or claims on jurisdictional grounds, plaintiff's motion for summary judgment should be denied as to the second enumerated claim or claims, and the second enumerated claim or claims should (to that extent) be dismissed without prejudice for lack of subject-matter jurisdiction.

Plaintiff's second enumerated claim or set of claims does not appear otherwise to fall afoul of the *Rooker-Feldman* doctrine.

To the extent that plaintiff's second enumerated claim or set of claims sounds in equal protection and arises out of the alleged fact that M. MacFarlane was permitted to give the children more expensive Christmas gifts than plaintiff was, because plaintiff has offered no evidence in support of the claim to the extent so premised, he has not met his burden to establish his entitlement to summary judgment as a matter of law in connection with that claim. Plaintiff's motion for summary judgment should therefore be denied as to his second enumerated claim or set of claims to the extent so premised. Because the moving defendants' sole argument (for present purposes) in favor of dismissal of plaintiff's second enumerated claim or set of claims, to the extent so premised, is that this court lacks jurisdiction to consider its merits under the *Rooker-Feldman* doctrine, and because the Multnomah County court's judgment did not address the respective rights of plaintiff and M. MacFarlane to give the children gifts, the moving

defendants' motion to dismiss should be denied as to plaintiff's second enumerated claim or claims to the extent premised on permission granted to M. MacFarlane to give the children more expensive Christmas gifts than plaintiff was permitted to give them.

To the extent that plaintiff's second enumerated claim or set of claims sounds in due process, and arises out of the conduct of one or more of the defendants either in confiscating cell phones from the children without due process or in canceling plaintiff's parental visits without prior notice, plaintiff has offered undisputed evidence that an unidentified person took and later returned the children's cell phones, and undisputed evidence that unidentified parties canceled plaintiff's parental visits on more than one occasion without prior notice to plaintiff. However, plaintiff's evidence does not establish the personal involvement of any specific individual defendant in that conduct, and liability does not lie against individuals under Section 1983 absent the individuals' personal involvement in the complained-of deprivation of rights. *See, e.g., Starr v. Baca*, 652 F.3d 1202, 1207-1208 (9th Cir. 2011). Similarly, plaintiff's evidence does not establish that the complained-of deprivations of his rights were caused by any policy or practice of DHS or of the Program, and liability does not lie against a state agency under Section 1983 unless the complained-of deprivation of rights took place pursuant to a policy or practice promulgated or adhered to by the agency. *See, e.g., Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Plaintiff has therefore not established his entitlement to summary judgment as a matter of law in connection with his second enumerated claim or set of claims to the extent so premised. Accordingly, plaintiff's motion for summary judgment should be denied as to his second claim or set of claims to the extent premised on the conduct of one or more of the defendants either in confiscating cell phones from the children without due process or in

canceling plaintiff's parental visits without prior notice. Because the moving defendants' sole

argument (for present purposes) in favor of dismissal of plaintiff's second enumerated claim or

set of claims, to the extent so premised, is that this court lacks jurisdiction to consider its merits

under the *Rooker-Feldman* doctrine, and because the Multnomah County court's judgment did

not address plaintiff's right to provide the children with cell phones or plaintiff's right to

notification of canceled parental visits, the moving defendants' motion to dismiss should likewise

be denied as to plaintiff's second enumerated claim or claims to the extent so premised.

### C. Plaintiff's Fourth Enumerated Claim (Arising Out of the Trommlitz-Leasias and/or Janice's Conduct in Subjecting T.R. and K.M. to Religious Studies and Activities)

As noted above, plaintiff's fourth enumerated claim arises out of the alleged conduct of

the foster-parent defendants in requiring T.R. and K.M. to attend religious studies and to

participate in religious activities. *See* Complaint at 5. Plaintiff characterizes his fourth

enumerated claim as a violation of the separation of church and state guaranteed by the First

Amendment, but because the establishment clause is without application to foster parents (who,

as discussed above, do not act under color of state law), the fourth enumerated claim appears

most clearly to sound in substantive due process under Section 1983, as an alleged violation of

plaintiff's right to direct his children's education. In support of his fourth enumerated claim,

plaintiff offers his own declaration testimony as follows:

> Throughout the years of me being involved raising my precious daughters, I, and
> the mother would try to educate them on the various religious sects by taking them
> to Catholic, Christian, latter day saints, Jevoha [*sic*] witness functions so I could
> try to educate them on different beliefs. Clearly, no person or child should be
> forced to follow something they very well not feel comfortable with.

Plaintiff Decl., ¶ 21.

To the extent the claim is brought against the foster-parent defendants under Section 1983 (whether as a First Amendment or a Fourteenth Amendment claim), it is subject to dismissal with prejudice for the reasons discussed above. To the extent the claim is brought against any other defendant in connection with any such defendant's role in placing the children into the custody of the Trommlitz-Leasias and/or Janice, this court lacks jurisdiction to consider it under the *Rooker-Feldman* doctrine, also for reasons discussed above. It follows that plaintiff's motion for summary judgment should be denied as to plaintiff's fourth enumerated claim, that the moving defendants' motion to dismiss should be granted as to plaintiff's fourth enumerated claim, and plaintiff's fourth enumerated claim should be dismissed with prejudice to the extent alleged against the foster-parent defendants (as discussed above) and without prejudice on jurisdictional grounds to the extent alleged against any other defendant (for reasons discussed above).

## CONCLUSION

For the reasons set forth above, plaintiff's motion (#8) for summary judgment should be denied in its entirety, the moving defendants' motion to dismiss should be granted in part and denied in part as discussed above, the minor child plaintiffs should be dismissed without prejudice as parties to this action, all of plaintiffs' claims to the extent brought under Section 1983 should be dismissed with prejudice to the extent alleged against S. Trommlitz-Leasia, L. Trommlitz-Leasia, and/or Janice, and plaintiff's first, third, and fourth enumerated claims, together with his second enumerated claim (or set of claims) to the extent arising out of differential parental visit rights granted to plaintiff and M. MacFarlane, should be dismissed without prejudice for lack of subject-matter jurisdiction to the extent alleged against any other defendant. Plaintiff's second enumerated claim (or set of claims) should otherwise survive the

Page 33 - FINDINGS AND RECOMMENDATION

moving defendants' motion to dismiss.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement..

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

Dated this 14th day of August, 2017.

Honorable Paul Papak
United States Magistrate Judge